IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SHARON FENTRESS-BUSSEY,  )
           )
  Plaintiff,      )
           )
  v.         )  Civil Action No. 1:23-cv-1080 (RDA/IDD)
           )
PETE HEGSETH, *in his official capacity* )
*as Secretary, U.S. Department of Defense*, )
           )
  Defendant.     )
           )

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Pete Hegseth's Motion for Summary Judgment (Dkt. 29) (the "Motion"). This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Motion together with Defendant's Memorandum of Support (Dkt. 30), Plaintiff Sharon Fentress-Bussey's Opposition (Dkt. 32), and Defendant's Reply Brief (Dkt. 33), this Court GRANTS the Motion for the reasons that follow.

I.   PROCEDURAL BACKGROUND

Plaintiff filed her Complaint on August 15, 2023, asserting the following claims: (i) race and color discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); (ii) retaliation in violation of Title VII; (iii) age discrimination in violation of the Age Discrimination in Employment Act (the "ADEA"); and (iv) retaliation in violation of the ADEA. Dkt. 1. On October 25, 2023, Defendant filed a Motion to Dismiss. Dkt. 9. After briefing on the Motion to Dismiss was completed, this Court issued a Memorandum Opinion and Order granting

in part and denying in part the Motion to Dismiss. Dkt. 19.  The Court granted the Motion to

Dismiss with respect to the claims of color discrimination, Title VII retaliation, age discrimination,

and ADEA retaliation. *Id.* at 14.[1]  The Court denied the Motion to Dismiss with respect to the race

discrimination claim. *Id.*  Plaintiff was given leave to amend her claims of color discrimination

and Title VII and ADEA retaliation but declined to file an amended complaint. *Id.*  On September

6, 2024, Defendant filed an Answer, and the Court subsequently issued a Scheduling Order. Dkts.

22, 23.

On February 14, 2025, Defendant filed his Motion for Summary Judgment. Dkt. 29.  On

February 28, 2025, Plaintiff filed her Opposition. Dkt. 32.  On March 6, 2025, Defendant filed his

Reply. Dkt. 33.

## II.    UNDISPUTED STATEMENT OF FACTS

Before analyzing the Motion at issue here, the Court must first determine the undisputed

summary judgment record, as summary judgment is only appropriate where there are no genuine

disputes of material fact.  Defendant appropriately set forth its Statement of Undisputed Facts with

citations to the record as required by the Local Rules and the Rule 16(b) Scheduling Order. *See*

Dkt. 30 at 2-18; Dkt. 26 ¶ 10(f); E.D. Va. L.R. 56(B) (requiring the moving party to list all material

facts as to which there is no genuine issue and to cite to portions of the record).[2]  Plaintiff, in her

Opposition, partially complied with the Local Rules.  Plaintiff properly set forth her limited

---

[1] Unless otherwise indicated, all page number citations refer to the CM/ECF assigned page numbers for a particular document.

[2] Although Defendant appropriately complied with the rules, defense counsel is advised that in future filings the Court's preference is to have summary judgment exhibits entered as individual attachments to the main document on CM/ECF rather than a single attachment with over 900 pages.  A single attachment containing multiple exhibits is difficult for the Court to review, especially when dealing with the number and length of exhibits here.

disputes with some of the asserted undisputed facts. Dkt. 32 at 8-9. Plaintiff, however, has also improperly set forth her own "FACTS" Section within her Opposition. *See id.* at 3-7. Confusingly, there is no indication whether Plaintiff contends that her own factual recitation is disputed or undisputed and many of the purported factual statements within this section appear to be pure argument, unsupported by any record citation. *Id.* As this Court and other judges in this District have repeatedly instructed parties, "[n]o provision in the Local rules . . . invites such a fact statement," *Amazon.com, Inc. v. WDC Holdings, Inc.*, 2023 WL 2815140, at *2 n.6 (E.D. Va. Apr. 6, 2023), and such narrative recitations of facts make it "difficult to determine exactly which material facts are disputed," *Tankesley v. Vidal*, 2023 WL 4273763, at *10 (E.D. Va. June 23, 2023). Nonetheless, the Court has reviewed all of the parties' submissions[3] and determined that the following facts are undisputed:

1. In May 2013, Plaintiff began working at the Defense Security Services ("DSS") as a Government Grade-9 ("GG-9").

2. Throughout her time at DSS, Plaintiff changed roles several times at the request of management.

3. In 2019, DSS was reorganized into what is known today as the Defense Counterintelligence and Security Agency (the "DCSA").

4. In 2019, Plaintiff was a GG-13 Program Analyst supervised by Kim Colon.

5. Over the course of 2019 through 2021, Plaintiff's position within DCSA changed several times as the structure of the agency changed.

6. Part of this was due to a larger reorganization of DCSA, which included a merger of several division to create the Industrial Security ("IS") directorate. This reorganization included the merger of the division in which Plaintiff worked.

---

[3] The Court has generally reviewed Plaintiff's "FACTS" Section. Where such facts are supported by record evidence citations and not contradicted by other information in the record, the Court has included such facts in findings of Undisputed Statement of Facts. The Court also resolves any disputes with respect to any specific asserted undisputed fact in the footnotes.

7. In October 2019, Kristen Cahill, a white GG-15 level employee, was asked to: (i) lead the merger; (ii) create a Chief of Staff's office for the new directorate; and (iii) serve as the Chief of Staff.

8. The merger was an ongoing process that continued through approximately April 2020.

9. In creating the Chief of Staff's Office, Ms. Cahill inherited existing staff – including Plaintiff – in late 2019.

10. In March 2019, Helena Brown, a white GG-14 level employee, served as the resource management branch chief under Matt Roche, fulfilling a deputy-like role and supervising several civilians and contractors.

11. Ms. Brown was the only GG-14 employee in the newly created Chief of Staff Office under Ms. Cahill's chain of command. A position like deputy chief required a GG-14 employee based on the "level of visibility, exposure, workload demand, the writing, [and] the critical thinking involved in that position."

12. After the merger, Ms. Brown continued to perform those same deputy duties under Ms. Cahill and was given the functional title of Deputy Chief of Staff.

13. DCSA policy did not require Ms. Brown to compete for the position because her new role was within the same grade she currently held (*i.e.* GG-14).[4]

14. In any event, "there was no vacant billet or position to announce" the deputy chief position in order to open it for competitive hiring.[5]

15. At that point, in March 2020, Ms. Brown became Plaintiff's direct supervisor.

16. Under Ms. Cahill, Plaintiff was performing resource management and personnel duties such as assisting with personnel actions (*i.e.* reassignments, retirements, and hiring) and

---

[4] Plaintiff did *not* attempt to dispute the asserted fact with respect to the propriety of Ms. Brown ascending to the Deputy Chief role. Accordingly, there is no genuine dispute with respect to Defendant's asserted fact. In her improper "FACTS" Section, however, Plaintiff asserts Ms. Cahill failed to follow "the DCSA hiring guide" and that Ms. Brown was put "into the position without a proper job announcement." Dkt. 32 at 4. In addition to failing to properly dispute the fact asserted by Defendant, the citations to Plaintiff's own deposition testimony do not support that Ms. Brown's placement in the Deputy Chief role was improper. Dkt. 30-1, Plaintiff Dep. Tr. at 25 (recognizing that Plaintiff's opportunities changed when Ms. Brown became part of the office, but not asserting that there was anything improper regarding Ms. Brown's position).

[5] A billet is an authorization to hire an individual and is used to track vacancies. Every individual is on a billet, and a new employee cannot be brought in unless this a vacant billet available.

overseeing the agency's "tasker" system for the directorate – which was a method of fulfilling requests for communication within the agency.

17. After the merger, there was another employee in the Chief of Staff's Office fulfilling those same duties on a larger scale – making it duplicative for Plaintiff to do them as well. Accordingly, that portfolio of work was removed from Plaintiff and reassigned to the other individual.

18. As the merger progressed, Plaintiff took on new responsibilities, including those of space management and overseeing the Cogswell project (an industry awards conference).

19. Under Ms. Brown's supervision, Plaintiff had a "pretty hefty portfolio" with "a lot of responsibility," including taking on "a lot of high visibility projects."

20. Due to the merger, there was a lot of "fluidity" in assignments and roles within the Chief of Staff's Office.

21. Most of the employees within the new directorate – including Ms. Brown and Ms. Cahill – found themselves with outdated position descriptions ("PDs") that did not necessarily align with the roles and responsibilities that they were carrying out post-merger.

22. DCSA leadership decided "to not make major updates across the board" for PDs because the process was too time and resource consuming.

23. Most PDs, however, including Plaintiff's, made employees responsible for "other duties as assigned" – which "left the window open for other workload that could be assigned to you, or you could be asked to do." While outdated, Plaintiff's PD was "still relevant to the work she was performing in the Chief of Staff [O]ffice." In turn, employee performance was evaluated based on performance objectives – not PDs.

24. The Chief of Staff's Office had two focus areas: (i) mission integration; and (ii) resource management. Mission integration work included logistics, staff meetings, IT issues, trainings, space, facilities, and the tasker's system. Resource management included work involving budget, contracts, and personnel.

25. At first, both of these areas were lumped together so that Ms. Cahill and Ms. Brown had oversight over both portfolios. The Chief of Staff's Office soon became oversaturated with work, however, and "it seemed prudent to be able to split" the two areas out.

26. This process required a new organizational structure within the Chief of Staff's Office, leadership approval, and moving personnel around within the Office. Ms. Cahill also requested, and received approval, to hire a manager to oversee the mission integration portfolio.

27. Bringing in a new manager required upgrading an existing billet in the Chief of Staff's Office from GG-13 to a GG-14 position. The new manager would occupy the new GG-14 position and take over duties that were previously spread across multiple individuals, including Ms. Cahill and Ms. Brown.

28. Ms. Brown, previously Deputy Chief for the entire Office, would become the branch chief of resource management.

29. In early 2022, Plaintiff was supporting mission integration for the Office.

30. Plaintiff was excited to perform those functions because it gave her "the opportunity for promotion" and "for career progression." Plaintiff was "standing up the branch on the mission integration [side]," which put her in a good position to compete for the branch chief position that would soon open. She had been performing "some of the duties" of the branch chief position, "but not all of the duties."

31. Both Ms. Brown and Ms. Cahill issued Plaintiff numerous monetary awards while serving as her supervisors. Ms. Cahill nominated Plaintiff for employee of the quarter and employee of the year, which Plaintiff won. Ms. Cahill and Ms. Brown consistently rated Plaintiff as "excellent" in performance reviews.

32. All parties testified to having good working relationships before the non-selection that led to this lawsuit.

33. On April 4, 2022, DCSA posted a job announcement on USAJobs for a GG-14 Supervisory Program Analyst position (the "Position"), to serve as the Mission Integration Branch Chief in the Chief of Staff's Office. The position did not require any DCSA-specific experience.

34. Plaintiff applied for the position in April 2022 and was later interviewed for it via telephone. All interviews were conducted remotely.

35. Before applying for the Position, Plaintiff had not applied for any other positions within the agency.

36. The hiring panel consisted of: (i) Ms. Brown, as panel chair; (ii) Randy Staples (an African-American man); and (iii) Daniel Finucane (a white man). As panel chair, Ms. Brown established the panel, the resume review criteria, and the interview questions – with the Human Capital Management Office's approval (also known has "HCMO").

37. Plaintiff did not know Mr. Staples before the interview and had only seen Mr. Finucane in meetings. Because she did not know them, Plaintiff does not view them as discriminating against her. *See* Dkt. 30-1, Plaintiff Dep. Tr. at 114:1-2 ("Because I don't know them. So I wouldn't say, yeah, I know they discriminated against me also, no.").[6]

---

[6] Plaintiff asserts that Defendant's summary in his Statement of Undisputed Material Facts mischaracterizes Plaintiff's deposition testimony. Dkt. 32 at 8. Plaintiff's argument is unpersuasive. Nonetheless, the Court has paraphrased the testimony as well as including a direct quote from the relevant testimony. Plaintiff points to no other deposition testimony that would expand on this testimony, which asserts that she does not view Mr. Staples or Mr. Finucane as discriminating against her. Thus, there can be no genuine dispute as to the asserted fact.

38. Ms. Cahill was the selecting officer for the position. She did not participate in the resume review or the first-round interviews, although two resumes were sent to Ms. Cahill before the first-round interviews.[7]

39. As was customary, Ms. Cahill communicated her expectations of the new hire to Ms. Brown. Specifically, Ms. Cahill stated that she wanted a "communicator and collaborator" not "someone who's savvy in all these areas of mission integration." Ms. Cahill also wanted a "business-minded individual who can think strategically and problem solve" as well as "oversee many projects and tasks," and "take a little info and process and research to build a product or meet intent." Overall, Ms. Cahill stated that leadership skills were "a must."

40. Ms. Brown conveyed Ms. Cahill's expectations to the hiring panel before they began the resume review process.

41. Following the standard hiring process used across DCSA, the panel began with a resume review of all those individuals who were certified by HCMO as eligible for the position. Each panel member individually scored each resume using the established resume review criteria. The panel members scores were then combined to create a total resume score.

42. Ms. Brown then provided the top resume scores to HCMO along with a recommendation regarding how many people the panel wanted to interview. In doing so, the panel looked for a "natural break in the scoring." Namely, a point at which it makes sense to interview everyone above a certain score. Best practice was to interview five people.

43. The panel initially selected five applicants to interview, using a cut-off score of 55. One of the five, however, declined to interview. HCMO then advised Ms. Brown to drop the cut-off score to 53 – the next natural break in the scoring.[8]

44. The hiring panel extended interview invitations to the top seven candidates, but one additional candidate declined. Thus, the panel interviewed a total of six applicants, including Plaintiff.

45. Of the three panel members, Ms. Brown gave Plaintiff the highest scores on her resume review and equal – or higher – scores on Plaintiff's answers to the interview questions.

---

[7] Plaintiff objects that Defendant's asserted undisputed fact "misrepresents the evidence that Ms. Brown shared at least two resumes with Ms. Cahill before the first interviews." Dkt. 32 at 8. Although this additional information appears immaterial, the Court has included Plaintiff's additional factual assertion in the interest of completion. Having so modified the asserted fact, there is no genuine dispute as to Defendant's asserted facts regarding Ms. Cahill's role in the process.

[8] Ms. Cahill was aware of the move from five to seven interviews, based on a discussion with Ms. Brown, and approved the interviewing of seven people. Dkt. 32-1 at 178.

46. In interviews, the panel asked each applicant the same eight questions and scored their answers against established criteria. The panelists then combined their scores for each question to give each candidate a total interview score.

47. With a total interview score of 80, Plaintiff ranked fourth out of the six interviewed applicants.

48. The interview notes from the panel noted that Plaintiff "[d]id not answer all parts of multi-part questions," "struggled with this question," and provided "not really a specific example" for various questions. Another note stated, "[w]onder whether there would've been a better example" for various questions.

49. On May 25, 2022, the panel referred the two highest scoring applicants – Holly Breault and Desiree Tiggart (scoring 91 and 87 respectively) – for further consideration. HCMO provided Ms. Cahill with the panel's recommendation.

50. Plaintiff's interview score "did not put her at the top of the list to compete for the second-round interview."

51. Ms. Cahill interviewed both Ms. Breault and Ms. Tiggart, asked them the same two questions, and scored their answers. Ms. Breault scored higher than Ms. Tiggart on both questions.

52. After receiving reference checks for Ms. Breault, Ms. Cahill selected Ms. Breault for the position on June 13, 2022.[9]

    a. Ms. Breault previously worked as a program manager at the Federal Benefits Unit ("FBU") within the Department of Defense.

53. Ms. Cahill believed that Ms. Breault "was the best candidate for the position" because she scored the highest in both interviews and had "extensive experience" in a multitude of key areas, including "writing, editing, and updating policy and procedures, serving as the lead for communicating complex topics to senior audiences, implementing improvements, conducting follow-through on actions to ensure closure, leading working groups, and negotiating changes to policy and procedures with internal and external stakeholders at all levels."[10]

_____

[9] Defendant's asserted fact states that Ms. Breault was selected on "June 13, 2025." Dkt. 30 at 10. Given the chronology of events here, the Court assumes that this was a typographical error and that Defendant intended to refer to 2022.

[10] Plaintiff attempts to dispute this asserted fact by acknowledging that Ms. Cahill utilized these criteria to determine that Ms. Breault was the best candidate but arguing that "the qualities listed had nothing to do with the job description." Dkt. 32 at 8. Because Plaintiff does not dispute that Ms. Cahill relied on these criteria, there is no genuine dispute. Nonetheless, the Court addresses Plaintiff's argument – which is also incorrect. Plaintiff cites the job responsibilities in the Position announcement, which includes references to experience in the following: (i) managing

54. Ms. Brown believed that Ms. Breault was selected because she "had more experience in a managerial and leadership role and highlighted those attributes with specific examples/application and impact throughout the course of the interview."

55. Plaintiff believes that Ms. Cahill should have selected her for the position despite her being ranked fourth after the interviews.[11]

56. Plaintiff believes that the interview focused on the wrong questions and focused solely on her leadership skills. Dkt. 30-1, Plaintiff Dep. Tr. at 115:21-116:2 ("[T]hey didn't even ask me anything about the job. They just asked me [about] my leadership skills. That doesn't make sense. So that's how I rationalize the whole thing. And I always come back to if you cannot tell me that I didn't get the job because of my qualification[s], then it had to be something else.").

57. Until she was not selected for the Position, Plaintiff did not feel like Ms. Cahill or Ms. Brown discriminated against her.[12] Plaintiff believes that actions by Ms. Cahill with respect to other employees were racially discriminatory.

---

multiple and/or complex programs/projects, consolidating tasks, and developing Standard Operating Procedures; and (ii) serving as a primary point of contact with project sponsors, contractors, and internal/external stakeholders to communicate progress, project difficulties, and failure/success with management and other major stakeholders. *Id.* The qualities listed by Ms. Cahill appear to directly relate to the specialized experience noted in the Position announcement. Dkt. 30-1 at 454 (Ms. Cahill indicating the basis for her decision).

[11] Plaintiff objects that Defendant's asserted fact misrepresents the full context of why she believes that the selection process "was unfair and, therefore, discriminatory." Dkt. 32 at 8. Primarily, Plaintiff objects to Defendant's reliance on Ms. Cahill's notes from a July 6, 2022 meeting between Plaintiff and Ms. Cahill as unauthenticated and hearsay. *Id.* It is unnecessary for the Court to resolve the dispute regarding Defendant's reliance on the alleged July 6, 2022 meeting notes with respect to this dispute, because Defendant did not rely on that document alone; rather, Defendant relied on Plaintiff's deposition testimony. Plaintiff was asked whether she believes that she should have been selected even though she was not within the top three ranked candidates and she responded: "Yes, and let me tell you why." Dkt. 30-1, Plaintiff Dep. Tr. at 114:23-115:1. Furthermore, to the extent Plaintiff attempts to dispute this fact by saying it misrepresents Plaintiff's view and cites to Plaintiff's deposition testimony, the deposition testimony relied upon does not dispute the asserted fact and merely suggests that Plaintiff views the process as unfair because she thinks that the interview process focused on the wrong questions. *Id.* at 115:21-23 ("[T]hey didn't even ask me anything about the job. They just asked me [about] my leadership skills. That doesn't make sense."). The Court will add a fact to reflect Plaintiff's view, but the fact asserted by Defendant is clearly supported by the record and there can be no genuine dispute.

[12] Plaintiff does not dispute the asserted fact that she did not feel as though Ms. Cahill or Ms. Brown discriminated against her until her non-selection for the Position. Dkt. 32 at 9. Plaintiff, however, seeks to add context that she did believe that she had witnessed discrimination

58. Plaintiff discovered that she had not been hired for the Position after hearing from a co-worker that second round interviews were being scheduled.

59. On June 21, 2022, Plaintiff sought a meeting with Ms. Cahill.  They then met on July 6, 2022.[13]

60. During the meeting, Ms. Cahill had the impression that Plaintiff "was upset that she was not selected" for the Position because Plaintiff believed that "she had been filling those roles and functions that [Ms. Cahill and Ms. Brown] hired for."[14]

61. Plaintiff told Ms. Cahill that "she couldn't trust [her] or Lanie anymore," that she "fe[lt] mistreated," that "she no longer want[ed] to work in the chief of staff's [sic] anymore," that "she must get out," and that "she just want[ed] to delete her experience in the chief of staff's office [sic] off her resume."[15]

---

in the Chief of Staff's Office.  *Id.*  The Court will add Plaintiff's assertion as an additional undisputed fact.

[13] In her improper narrative "FACTS" Section, Plaintiff accuses Ms. Brown of "misrepresent[ing] her involvement with the July 6, 2022, meeting and present[ing] it as more antagonistic than appropriate." Dkt. 32 at 5 (citing Dkt. 30-1, Brown Dep. Tr. at 152-54). But the cited portions of the deposition do not support Plaintiff's accusation.

[14] Plaintiff attempts to dispute Defendant's asserted fact with respect to Ms. Cahill's view of Plaintiff during that meeting. Dkt. 32 at 9 (disputing the asserted fact "for the same reasons that Undisputed Fact No. 54 is disputed"). But Defendant's asserted fact comes directly from Ms. Cahill's deposition testimony. Dkt. 30-1, Cahill Dep. Tr. at 115-116 ("Sharon was upset that she was not selected because she had been fulfilling those roles and functions that we hired for"). Accordingly, there is no genuine dispute as to the asserted fact.

[15] Plaintiff again attempts to dispute Defendant's asserted fact in general terms. Dkt. 32 at 9 (disputing the asserted fact "for the same reasons that Undisputed Fact No. 54 is disputed"). In reference to what Plaintiff terms "Undisputed Fact No. 54," Plaintiff did reference two portions of her own deposition testimony. Their relevance here is unclear and Plaintiff makes no argument regarding how her deposition testimony contradicts or disputes Ms. Cahill's deposition testimony. But, to the extent Plaintiff's deposition testimony reflects on this July 6, 2022 meeting, Plaintiff testified "I was – I'm not – I can honestly say I don't remember word for word" the conversation during the July 6, 2022 meeting. Dkt. 30-1, Plaintiff Dep. Tr. at 120:2-3. In the other portion of deposition testimony generally referred to by Plaintiff, Plaintiff was asked whether anything else was discussed during the meeting, and Plaintiff responded: "We probably did.  I'm not sure specifically, but we probably did." *Id.* at 124:1-6.  When asked whether Plaintiff told Ms. Cahill anything else, she testified: "Not specifically [that] I remember, but I do remember telling her I didn't need her help." *Id.* at 124:22-24.  Thus, Plaintiff's testimony that she does not recall the specifics of her meeting with Ms. Cahill does not contradict Ms. Cahill's memory of that meeting. Further, to the extent that Plaintiff objects to Defendant's reliance on Ms. Cahill's notes from the July 6, 2022 meeting (Defendant Exhibit 36), the Court need not resolve that objection here,

62. "Based on what [Plaintiff] relayed to [Ms. Cahill] in that meeting," it was "very clear" to Ms. Cahill that "Plaintiff wanted to leave the chief of staff's office [sic]."[16]

63. After the July 6, 2022 meeting, Ms. Cahill reached out to Shannon Hilbert in HCMO for guidance on what options were available, given her perception that Plaintiff "was so upset and wanted to get out and wanted to leave the chief of staff's office [sic]."

64. An additional concern was how Plaintiff's desire to leave would affect the rest of the Chief of Staff Office. For example, Plaintiff expressed that she was unwilling to train Ms. Breault on the work of the mission integration branch.[17] Indeed, after finding out that she was not selected for the Position, Plaintiff removed all of her work from a shared drive so others could not access it. *See* Dkt. 30-2 at 98-99 ("I don't plan to, I've taken all my work off of the share drive. She asked me to stand up this section which I did, all the work in the folders is my work [sic] no one else's, now she wants me to give all that information to someone else. She's got me twisted I'm not doing that, that person can figure it out for themselves.").

65. Ms. Cahill and Ms. Brown "both agree[d] they can't have Ms. Bussey work for the incoming GG-14 based on her outburst [at the July 6 meeting] as it will not set anyone up for success."

---

because Defendant's asserted fact is based on Ms. Cahill's deposition testimony, which remains uncontradicted. Accordingly, there is no genuine dispute of fact in this regard.

[16] Plaintiff again attempts to dispute Defendant's asserted fact in general terms. Dkt. 32 at 9 (disputing the asserted fact "for the same reasons that Undisputed Fact No. 54 is disputed"). As noted *supra*, in reference to what Plaintiff terms "Undisputed Fact No. 54," Plaintiff did reference two portions of her own deposition testimony. That testimony appears to have no relevance with respect to the asserted fact here; nor could it, because the asserted fact is based on Ms. Cahill's impression of the meeting with Plaintiff. Accordingly, there is no genuine dispute of fact in this regard.

[17] Plaintiff also attempts to dispute the asserted fact by Defendant regarding Plaintiff's unwillingness to assist Ms. Breault or continuing performing certain duties. Plaintiff appears to misapprehend Defendant's citations. The language cited by Defendant comes directly from deposition testimony. *See* Dkt. 30-1, Booker T. Bland Dep. Tr. at 84:3-11 ("She shared with me that Sharon was not willing to train the -- the person that was ultimately selected for the job and - - and refused to train that individual."); *id.* at 83 (stating that Ms. Cahill informed him that Plaintiff "was not willing to perform tasks and -- and duties that were within the chief of staff's office"); *see also id.* at 21-22 (discussing that Plaintiff told Mr. Bland that she felt micromanaged in part because she would have to train Ms. Breault). Plaintiff correctly notes that, to the extent Defendant relies on a declaration from Mr. Bland, the cited page – page 5 – does not exist, but Defendant provided no quote or parenthetical with respect to that citation in any event such that the citation itself is immaterial. Accordingly, there is no genuine dispute as to the asserted fact.

66. Ms. Cahill and Ms. Hilbert discussed several options, including a management directed reassignment – where Ms. Cahill, as Plaintiff's manager, had "the authority to be able to move an individual and that's governed by HCMO processes."

67. Ms. Hilbert also discussed the option of a detail with Ms. Cahill. Namely, a "temporary arrangement where an individual is supporting another office for a time bound requirement, fulfilling a . . . specific role."

68. Ms. Cahill sent Plaintiff a follow-up email after the meeting "point[ing] her to touch base with HCMO employee relations if she wanted to address her concerns."

69. On July 7, 2022, Ms. Hilbert sent Plaintiff an email outlining "the four avenues of redress available to [her] as a DCSA employee."

70. The next week, on July 12, 2022, Ms. Brown emailed Plaintiff asking for a status update on a project that Ms. Cahill had previously assigned to Plaintiff.

71. Plaintiff responded to Ms. Brown with the following:

   "I'm still working this case [sic] is there a reason why you're inquiring about a due date, this isn't my first time serving as an FLO and you've never asked about my progress or due date assigned [sic]? I will send Billy what I have to wrap this up so you won't think I'm taking too long."

72. Twenty-four minutes later, Plaintiff followed up with a second email to Ms. Brown:

   BLUF [Bottom Line Up Front]: Lanie

   How is this one coming? Was there a due date assigned from [Logistics Management Office ("LMO")]? Please send me a status update – thanks!

   **ANSWER:**

   Just sent Billy from LMO, the DD Form 200 and Memorandum for record. Waiting for his response to see there is anything else required. Was there something else you needed?[18]

---

[18] Confusingly, although Plaintiff did not even attempt to dispute the asserted facts regarding the July 12, 2022 emails in her enumerated responses to Defendant's Undisputed Statement of Facts, Plaintiff's improper "FACTS" section suggests that, instead of being two separate emails, the emails are in fact duplicates of one another wherein only the version produced by Defendant contains the allegedly disrespectful language. Dkt. 32 at 5. Because this argument was not properly raised as required by the Rules and the Rule 16(b) Scheduling Order, it is improper and waived. In any event, the argument is incorrect, as it is clear that there are two different emails. Dkt. 30-1 at 110, 113. For that reason and for the reasons set forth in Defendant's Reply Brief, Plaintiff's argument is improper and unpersuasive. Dkt. 33 at 5-6.

73. Ms. Brown responded to Plaintiff that she had "wanted to ensure we're working to close this out in a timely manner."[19]

74. To Ms. Brown, Plaintiff's initial response to her request for a status update was "rude," "pretty aggressive," and "came across as a bit hostile."[20]

   a. Ms. Brown's supervision of Plaintiff included other examples of Plaintiff engaging in what Ms. Brown perceived as rude email communications. *See* Dkt. 30-2 at 128 ("Monica who do you think your talking to [sic]? Seriously? I don't need you talking to me like I'm a child . . . . From here on out I will not be communicating with you."); *id.* at 131 (explaining her email to Ms. Cahill as "I'm not a sensitive person but needed to say something at that point"); *id.* at 135 (Ms. Brown emailing Ms. Cahill regarding correspondence from Plaintiff: "This email below is frustrating at best and certainly feels like Sharon and I have gotten off on the wrong foot-unbeknownst to me."); *id.* at 136 (Ms. Brown to Ms. Cahill regarding Plaintiff: "I'm not loving these seemingly rude/disrespectful emails . . . this is 3 examples of it in the last week between me and direct to HCMO."); *id.* at 138-43 (Ms. Brown documenting rude emails from Plaintiff). see also Dkt. 30-1, Brown Dep. Tr. at 135:17-136:4 ("I had observed the rudeness in the very beginning of our relationship.").

75. Ms. Brown forwarded Plaintiff's initial response to Ms. Cahill "to make her aware of the disrespectful tone."

76. Ms. Cahill responded that she would "engage Sharon with correspondence regarding her disrespect." Dkt. 30-2 at 117.

77. Ms. Brown also shared Plaintiff's email with Deana Rasnick, the Chief of Employee Relations in HCMO.

---

[19] Plaintiff attempts to dispute this asserted fact as taking "the quote out of context." Dkt. 32 at 9. An examination of the email chain at issue reveals that this was a portion of Ms. Brown's response and no other portion of the email appears relevant, nor does Plaintiff identify the missing context. Dkt. 30-2 at 113. Rather, Plaintiff asserts that the email does not address a "so-called rude comment." Dkt. 32 at 9. But this is argument, not a factual dispute. Accordingly, there is no genuine dispute of fact with respect to the asserted fact.

[20] Plaintiff again attempts to dispute this asserted fact as "taken out of context." Dkt. 32 at 9. Plaintiff asserts that there is a response from Ms. Cahill that should be referenced. *Id.* Accordingly, Plaintiff does not dispute the asserted fact and thus there is no genuine dispute. But, the Court will add the portion of the email chain that Plaintiff contends is additional context as a separate undisputed fact, especially as Defendant "agrees" that Plaintiff's assertions regarding Ms. Cahill's response is accurate. Dkt. 33 at 13.

78. Both Ms. Rasnick and Ms. Cahill agreed that the tone of Plaintiff's email was unacceptable.

79. Ms. Brown spoke to Ms. Rasnick about how to proceed, and Ms. Rasnick recommended that Plaintiff be held accountable for the email with a letter of counseling.

80. Ms. Rasnick drafted the letter of counseling for Plaintiff, to which Ms. Brown and Ms. Cahill provided input.

81. On July 19, 2022, Ms. Cahill signed and issued the letter of counseling to Plaintiff.

82. The letter documented Plaintiff's recent "disrespectful and unprofessional behavior," including the events of the July 6, 2022 meeting and Plaintiff's July 12, 2022 email to Ms. Brown.

83. Plaintiff was cautioned to "act professionally and respectfully at all times" and specifically "to maintain professionalism and interact in a respectful manner with Ms. Breault," who would become Plaintiff's new supervisor in August 2022.

84. The letter of counseling was "not a disciplinary action" and was not placed in Plaintiff's official personnel folder.

85. Plaintiff declined to sign the letter of counseling.

86. In late July 2022,[21] Booker Bland, an African American GG-15 employee, was working to establish the new Enterprise Security Office ("ESO") and reached out to Ms. Cahill to request additional personnel.

87. Ms. Cahill was already aware that Mr. Bland was short-staffed and needed "additional resources" because he was "about to hit a bow wave of workload."

88. Ms. Cahill spoke to Mr. Bland about the option of Plaintiff joining his team because Ms. Cahill believed that Plaintiff "want[ed] to leave the chief of staff's office [sic] as soon as possible."

89. On July 25, 2022, Ms. Cahill and Ms. Brown sent Plaintiff a calendar invite for July 26, 2022, titled "Way Ahead," intending to "[d]iscuss an option to support another division."

90. Plaintiff responded that she had "a prior meeting at that time" and also "need[ed] to ensure [she] ha[d] representation with [her]" at the meeting.

91. Ms. Cahill consulted with HCMO regarding how to proceed given that Plaintiff had declined the meeting and requested representation.

---

[21] The asserted fact refers to "late July 2020." Dkt. 30 at 15. This again appears to be a typographical error, as the documents relied upon make clear that the facts relate to July 2022. Dkt. 30-1, Bland Dep. Tr. at 45-46 (referring to "July 25th, 2022").

92. HCMO told Ms. Cahill that she could put Plaintiff on a detail to ESO while a permanent reassignment was being processed.

93. Late in the afternoon of July 26, 2022, Ms. Cahill sent an email to Plaintiff responding to her request for representation at the "Way Ahead" meeting. Before sending the email, Ms. Cahill sought and received input from Ms. Hilbert in HCMO as to its contents.

94. Ms. Cahill told Plaintiff that she was not authorized to bring representation to the meeting and that she had decided "on a management directed reassignment" for Plaintiff to support ESO under Mr. Bland, who was short-staffed. Ms. Cahill stated that the reassignment would be processed through HCMO and, in the meantime, Plaintiff would be placed on a detail to ESO beginning on August 1, 2022, until the reassignment was finalized.

95. That same day, Ms. Cahill sent a draft statement of Plaintiff's duties for the detail to Mr. Bland for his review.

96. On July 28, 2022, Ms. Cahill sent HCMO the final version of Plaintiff's duties and dates for her detail.

97. On August 1, 2022, Plaintiff began her detail with the ESO under Mr. Bland's supervision.

98. Plaintiff believes that Mr. Bland is "a very good supervisor" and enjoys working for him.

99. Plaintiff's detail was initially set to end on December 3, 2022, but it was extended for an additional six months, to June 3, 2022.

100. Plaintiff continued working in the role thereafter.

101. In December 2023, at Mr. Bland's request, Matthew Redding, the Assistant Director of IS, formally and permanently reassigned Plaintiff to ESO.

102. Mr. Redding issued Plaintiff a memorandum informing her of her formal reassignment to ESO on January 3, 2024.

103. Neither Plaintiff's detail nor permanent assignment to ESO resulted in a change in her pay, her benefits, or her grade.[22]

---

[22] In her improper "FACTS" Section, Plaintiff asserts that her reassignment "stifled her ability for career advancement." Dkt. 32 at 5 (citing Dkt. 30-1, Bland Dep. Tr. at 77). The cited deposition testimony does not support that Plaintiff's opportunity for career advancement "was stifled" but that Plaintiff had concerns that it would be. Dkt. 30-1, Bland Dep. Tr. at 76-77 (Mr. Bland responding to a question regarding "[d]id she offer any reason why that concerned her," responded that "she did . . . it was about . . . being in her current position . . . would limit her ability to remain competitive"). This deposition testimony does not establish that Plaintiff was actually limited in her ability to obtain a promotion.

104.    Plaintiff has not applied to any jobs within DCSA since applying for the Position. Nor has Plaintiff applied for any detail or joint detail assignment ("JDA") since being detailed to ESO.

105.    Plaintiff first contacted the Equal Employment Opportunity Office ("EEO") about filing an EEO complaint on July 13, 2022.

106.    On July 18, 2022, Plaintiff submitted her Pre-Complaint Intake Questionnaire to the EEO Office.

107.    Ms. Cahill was notified that Plaintiff had entered into the EEO pre-complaint process on August 9, 2022.

108.    Plaintiff filed her formal EEO complaint alleging race and color discrimination and retaliation on August 29, 2022.

109.    On September 20, 2022, Plaintiff was issued a notice of partial acceptance regarding her EEO claims. DCSA dismissed one of Plaintiff's claims for untimeliness, namely that she was not afforded an opportunity to compete for the Deputy Chief of Staff position given to Ms. Brown. The remainder of Plaintiff's claims were accepted for investigation.

110.    On October 18, 2022, Mr. Redding informed both Ms. Brown and Ms. Cahill that Plaintiff had filed a formal EEO complaint.

111.    DCSA completed its investigation of Plaintiff's claims on March 2, 2023.

112.    On May 30, 2023, DCSA issued a Final Agency Decision, finding no discrimination or retaliation occurred.[23]

---

[23] In her improper "FACTS" Section, Plaintiff discusses the circumstances of Dhalia Thomas, also African American, and her detail to Critical Technology Protection, asserting that Ms. Thomas was also discriminated against. Dkt. 32 at 6. In the selection of Ms. Cahill's deposition testimony on which Plaintiff relies, Ms. Cahill avers that Ms. Thomas made a complaint to Ms. Cahill that she had "been defamed" or "misrepresented within the agency," but that she did not use the "word discrimination." Dkt. 30-1, Cahill Dep. Tr. at 31. Furthermore, as Plaintiff notes, Ms. Thomas sought out and obtained a detail reassignment. Dkt. 32-1 at 21-22. Thus, Plaintiff's argument that "Ms. Thomas was perceived as problematic because she raised concerns about racial discrimination" is unsupported by the record. Dkt. 32 at 6.

The remaining allegations that Plaintiff makes in her "FACTS" Section are argument unsupported by citations and are not appropriate for the Court to consider at summary judgment. *Lake Wright Hospitality, LLC v. Holiday Hosp. Franchising, Inc.*, 2009 WL 2606254, at *21 (E.D. Va. Aug. 20, 2009) (recognizing that "pure, unsupported argument . . . has no place in a purported statement of facts").

### III. STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. "(A) party opposing summary judgment may not simply rest on the allegations of his complaint, but must instead come forward with specific evidence showing the existence of a genuine issue of fact." *Muhammad v. Giant Food*, 108 F. App'x 757, 764 (4th Cir. 2004) (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

### IV. ANALYSIS

Following this Court's decision on the Motion to Dismiss, the only claim remaining in this litigation is Plaintiff's assertion of race discrimination under Title VII. A Title VII claim is generally analyzed within the burden-shifting framework set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[24] Here, Plaintiff asserts two bases for her race discrimination claims: (i) her non-selection for the Position; and (ii) her reassignment to ESO. As with Defendant, the Court assumes without deciding that Plaintiff has met her burden at summary judgment of establishing a *prima facie* case of discrimination and instead turns directly to whether Defendant has produced a legitimate, non-discriminatory reason for his actions and, if so, whether Plaintiff has established pretext. *See Sempowich v. Tacitle Sys. Tech., Inc.*, 19 F.4th 643, 650 (4th

---

[24] Plaintiff appears to seek to prove her claim of discrimination by way of circumstantial evidence, as she does not point to any direct evidence of race discrimination in the record. Thus, the *McDonnell-Douglas* framework applies here.

17

Cir. 2021). An employer's burden is only to "articulate" a legitimate, nondiscriminatory reason and is a burden of production. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007). A plaintiff may then produce evidence that the employer's justification is "unworthy of credence" or that there is other circumstantial evidence sufficiently probative of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 147 (2000). As the Fourth Circuit has instructed, "the core of every Title VII case remains the same, necessitating resolution of the ultimate question of discrimination." *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 255 (4th Cir. 2025) (internal citations and quotations omitted).

Ultimately, Plaintiff has failed to present any evidence suggesting that her race was the basis for either employment action of which she complains. Plaintiff's argument is best set forth in her own words in her deposition, where she asserts that, during the interview, "[t]hey just asked about me my leadership skills. That doesn't make sense. So that's how I rationalize the whole thing. And I always come back to if you cannot tell me that I didn't get the job because of my qualifications, then it had to be something else." Dkt. 30-1, Plaintiff Dep. Tr. at 115-16. Although such inferences regarding her non-selection and reassignment may be sufficient to establish a *prima facie* case of discrimination or to survive a motion to dismiss, Plaintiff's burden at summary judgment is higher. And, at this stage of litigation, Plaintiff has pointed to no evidence – outside of her non-selection and reassignment – which supports an inference of race discrimination or which establishes a genuine issue of material fact with respect to Plaintiff's non-selection or reassignment. Accordingly, the Motion will be granted.

### A.     Non-selection for the Position

Defendant has met its burden of articulating a legitimate, nondiscriminatory reason for Plaintiff's non-selection; namely, that Ms. Breault was better qualified as the top-scoring candidate

18

during the interview process. Dkt. 30. It is undisputed that Plaintiff was not one of the top-scoring candidates after the first round of interviews. Dkt. 30-1 at 899 (indicating that Plaintiff was fourth after the interviews). It is further undisputed that, of the three panel members, Ms. Brown gave Plaintiff the highest scores on her resume review and gave Plaintiff roughly the same score as the other two panel members on the interview round. *See* Dkt. 30-1, Exh. 23, at 869-906 (Plaintiff received a score of 20 on the resume review from Ms. Brown and a 19 and a 16 score from the other two panel members as well as a score of 27 on the interview round from Ms. Brown and a 26 and a 27 score from the other two panel members). The Fourth Circuit has made clear that a candidate's qualifications and job performance "are widely recognized as valid, non-discriminatory bases for any adverse employment decision." *Evans v. Technologies Applications & Servs. Co.*, 80 F.3d 954, 960 (4th Cir. 1996). Moreover, the Fourth Circuit has held that a subjective assessment such as interview performance is a valid, non-discriminatory basis for an adverse employment decision. *See Hux v. City of Newport News*, 451 F.3d 311, 316–19 (4th Cir. 2006) (affirming summary judgment for the employer after it chose not to select plaintiff in part based on her interview performance). The burden thus shifts to Plaintiff to establish that there are genuine issues of material fact suggesting that this proffered explanation is pretextual such that a reasonable jury could determine that the non-selection of Plaintiff was race discrimination. Plaintiff has failed to meet her burden on summary judgment in this regard.

Plaintiff attempts to establish pretext in two ways: (i) by arguing that Defendant emphasized qualities not pertinent to the job in selecting a candidate; and (ii) Plaintiff was the substantially more qualified candidate. Dkt. 32 at 14-16. To begin with, Plaintiff has made no showing that she was the more qualified candidate. Indeed, although Plaintiff recites the job qualifications in the job announcement and the interview questions asked, Plaintiff makes no effort

19

to analyze either her own qualifications or those of Ms. Breault against those standards. *Id.* As judges in this District and in the Fourth Circuit have recognized, a plaintiff's "self-assessment of her superior aptitude for the position fails to rebut the Government's legitimate explanation." *Phillips v. Esper*, 2020 WL 3579796, at \*15 (E.D. Va. June 30, 2020) (quoting *Moore v. Mukasey*, 305 F. App'x 111, 116 (4th Cir. 2008)). Thus, having failed to provide a comparison of the relative qualifications of herself and Ms. Breault, it appears that Plaintiff relies on her assessment alone and such self-assessment fails to establish a genuine issue of material fact as to pretext to satisfy Plaintiff's burden at summary judgment.

Nonetheless, reading between the lines of Plaintiff's Opposition, Plaintiff appears to suggest that she was more qualified for the Position because she was performing some of the duties of the Position already and because of her history within the Chief of Staff's Office. *Id.* at 7 (discussing how Plaintiff "prepared herself in every way possible to be competitive" for the Position). But, as the Fourth Circuit has recognized, an employee "cannot establish their own criteria for judging her qualifications for the promotion," and must instead "compete for the promotion based on the qualifications established by her employer." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 269 (4th Cir. 2005) (rejecting claim of pretext by an employee arguing she was more qualified because of her educational background and years of service). Here, Plaintiff asks the Court to look beyond her scores on the interview round and suggests that she should nonetheless have been selected based on her prior work in the Chief of Staff's Office. Dkt. 30-1, Plaintiff Dep. Tr. at 115-16 (asserting that she should have been selected for the Position notwithstanding her scores on the interview). Again, the Fourth Circuit has been clear in rejecting such arguments at summary judgment. *See Sherman v. Westinghouse Savannah River Co.*, 263 F. App'x 357, 370 (4th Cir. 2008) (rejecting claim of pretext where plaintiff "suggest[ed] that the

committee should have looked beyond her application materials to ascertain her prior work performance" and emphasizing that courts "do not sit as a super-personnel department weighing the prudence of employment decisions made by the defendants"). Moreover, that Plaintiff may have been superior to Ms. Breault in one area – her experience in mission integration – does not establish pretext where the decision is also based on other factors. *See Phillips*, 2020 WL 3579796, at *15 (finding that plaintiff failed to establish superior qualifications); *Harris v. Mayor & City Council of Balt.*, 429 F. App'x 195, 204 (4th Cir. 2011) (recognizing that, because experience was only one of the factors weighed in promotion decision, the plaintiff's "greater experience is not, by itself, sufficient to raise a reasonable inference of pretext"). Here, Plaintiff recognizes that the hiring panel was focused, in part, on leadership skills, and Plaintiff does not discuss how she had superior leadership skills to Ms. Breault. Dkt. 30 ¶ 27 (emphasizing need for communication and leadership skills); Dkt. 32 at 8 (undisputed); *see generally* Dkt. 32 (failing to discuss how Plaintiff possessed superior leadership or communication skills to Ms. Breault). Thus, Plaintiff's greater experience in mission integration is not alone sufficient to establish genuine issues of material fact as to pretext here.

Plaintiff's process argument – that the interview questions were unconnected to the job qualifications – fares no better. As Plaintiff correctly acknowledges, courts have recognized that "an employer's decision to emphasize qualities not pertinent to the job in selecting a candidate is probative of pretext." Dkt. 32 at 16 (citing *Lewis v. Prince George's Cnty. Bd. of Educ.*, 2024 WL 4711809, at *8 (D. Md. Nov. 6, 2024)). Here, the Position was a "Supervisory Program Analyst." Dkt. 30-1 at 853. As such, the person filling the Position would "[m]anage multiple existing and emerging projects and tasks," "[i]ntegrate with DoD and non-DoD stakeholders and lead working groups and internal DCSA activities," and "[p]rovide support to leadership in the formulation of

21

short-and-long-range planning guidance, management plans, and other associated actions." *Id.* at 855.   Specialized experience expected for the role includes: "plan[ning], develop[ing], integrat[ing], implement[ing], operat[ing], and maintain[ing] programs," "[m]anaging multiple and/or complex programs/projects," and "[s]erving as the primary point of contact with project sponsors, contractors, and internal/external stakeholders." *Id.* at 856.   As part of the interview process, the panel asked questions such as: (i) "[t]ell us about a time that you tackled a complex challenge"; (ii) "[d]escribe  your ability to communicate complex information to a variety of audiences"; and (iii) "[d]escribe your experience planning, leading, and executing a major event." Dkt. 30-1 at 872.   These questions obviously relate back to the specified job duties and required experience from the job announcement.   For example, the job announcement stated that applicants would be expected to manage "multiple and/or complex programs/projects," and therefore, interviewees were asked about a time "that you tackled a complex challenge."   Similarly, the posting stated that applicants could expect to be a primary point of contact for various stakeholders, and therefore, interviewees were asked about their ability to communicate to different audiences. In one question, the question itself described how it related to the position: "This position will require building relationships with various DCSA components to drive results, oftentimes without direct lines of authority.   Please describe your leadership style and experience working with and influencing others outside of your leadership chain of command." *Id.* at 872.   The very case that Plaintiff cites undermines her position as the *Lewis* Court recognized that it was unsurprising that an entity hiring for a "supervisory position" would emphasize "management and supervisory skills." *Lewis*, 2024 WL 4711809, at *8.   The *Lewis* Court therefore rejected that plaintiff's view that the defendant "should have valued his experience and education over Smith's leadership and

supervision skills in making the hiring decision." *Id.* Here too that argument fails, and Plaintiff therefore fails to establish a genuine issue of material fact with respect to her argument of pretext.

Plaintiff's Opposition makes some brief references to other arguments suggesting that there are circumstances that "have not been explained." Dkt. 32 at 16. But it was Plaintiff's burden to investigate those circumstances in discovery and provide evidence to the Court suggesting that the answer to her unresolved questions (which relate mainly to the influence that Ms. Brown played in the decision-making process)[25] is discrimination. Plaintiff has not done so here and, at the summary judgment stage, "unsupported speculation is not sufficient." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 308 (4th Cir. 2006) (affirming grant of summary judgment where plaintiff offered only "naked speculation and open-ended rhetorical questions"). Moreover, as the Fourth Circuit has emphasized the pretext inquiry is essentially merged with the "ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination, which at all times remains with the plaintiff." *Stokes v. Va. Dep't of Corr.*, 512 F. App'x 281, 282 (4th Cir. 2013). Here, Plaintiff has pointed to no undisputed facts suggesting that she was the victim of intentional discrimination. Plaintiff was part of a formalized process where she had previously had a good relationship with two of the decision-makers (Ms. Brown and Ms. Cahill) and where she had no reason to suspect that the other two decision-makers were biased (Mr. Finucane and Mr. Staples). Plaintiff points to no circumstantial evidence suggesting that *she* was discriminated against here.[26] Thus, Plaintiff has failed to establish that any genuine issue of material fact exists

---

[25] The import of the answers to Plaintiff's contemplations is especially unclear where, again, Ms. Brown rated Plaintiff most highly of the three panel members throughout the review process.

[26] In her improper "FACTS" section, Plaintiff refers to the reassignment of Dhalia Thomas and the statements of her current supervisor, Mr. Bland, to suggest that "race *could* have played a role in the selection process." Dkt. 32 at 7. But Plaintiff's burden requires more than this at

23

to suggest that she can establish pretext. At summary judgment, Plaintiff's suspicions are not enough and "it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the [employment decision]." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (citation and quotation omitted); *McNeal v. Montgomery Cnty., Md.*, 307 F. App'x 766, 774 (4th Cir. 2009) ("Mere speculation by the plaintiff that the defendant had a discriminatory motive is not enough to withstand a motion for summary judgment."). Accordingly, the Court will grant the Motion insofar as it relates to Plaintiff's nonselection for the Position.

### B.    Reassignment to ESO

The Court next examines Plaintiff's claim that she was discriminated against when she was reassigned to a position in ESO. Here, the Court again assumes without deciding that Plaintiff has established a *prima facie* case. Defendant has articulated that Ms. Cahill decided to detail (and ultimately reassign) Plaintiff to ESO because Plaintiff had indicated that she no longer desired to work in the Chief of Staff's Office and because Plaintiff was causing a fracture in the office. Dkt. 30 at 29; Dkt. 30-1, Cahill Dep. Tr. at 119-120 (testifying that Plaintiff stated she "no longer wants to work in the chief of staff's office anymore, that she must get out"); *id.* at 152 (testifying that there was "a fractured environment that was forming within the chief of staff's division between Sharon, and myself, and – and Lanie"); Dkt. 30-1 at 458 (Ms. Cahill averring that "Ms. Bussey stated numerous times that she can no longer work in the Chief of Staff office"). Thus, Defendant has produced a legitimate, nondiscriminatory reason for the detail to ESO, and the burden shifts to

---

summary judgment. With respect to Ms. Thomas, as Plaintiff acknowledges, Ms. Thomas applied for and was selected for a position that resulted in her transfer to another department. *Id.* at 6. With respect to Mr. Bland, Plaintiff does not suggest that Mr. Bland had any insight into the hiring process that she experienced, and his unsupported speculation as to what could have happened also does not satisfy her burden here.

Plaintiff to establish that there are genuine issues of material fact regarding pretext. Plaintiff fails to do so.

As Defendant notes, Plaintiff's Opposition largely fails to engage with Defendant's proffered legitimate, nondiscriminatory reason for the detail/reassignment. Dkt. 32 at 12-14. Rather than attempt to establish pretext, Plaintiff spends the majority of her Opposition discussing factors that largely go to whether she could establish a *prima facie* case, which both Defendant and this Court assume she could establish. *Id.* at 13 (arguing that a transfer is an adverse employment action); Dkt. 30 at 26 (Defendant "assuming *arguendo*, that Plaintiff can establish a *prima facie* claim of race discrimination"). Plaintiff otherwise rests on her assertion that "she observed that Ms. Cahill 'didn't like black people,'" which rests on her own deposition testimony. Dkt. 32 at 12 (citing Dkt. 30-1, Plaintiff Dep. Tr. at 85:6-23). But such testimony is unsupported by anything beyond Plaintiff's own speculation and anecdotal observations.[27] *McLemore v. Beach*

---

[27] In the testimony beyond that which is cited by Plaintiff, Plaintiff explained that she based her view on the treatment of Dennis Daniels, Ms. Thomas, Dwayne Hawkins, and Mr. Bland. By Plaintiff's telling, Ms. Cahill inherited Mr. Daniels from another department who said that they "don't want him back." Dkt. 30-1, Plaintiff Dep. Tr. at 86:10-11. Plaintiff observed that Ms. Cahill appeared not to like Mr. Daniels and asked Ms. Cahill about it; Ms. Cahill responded that she found Mr. Daniels "arrogant" because Ms. Cahill had been on a panel interviewing him and she felt "you would think he's interviewing us and we're not interviewing him." *Id.* at 86:22-87:4. With respect to Ms. Thomas, Plaintiff testified that, when Ms. Thomas was placed on Plaintiff's team, Plaintiff speculated, "why she got to be on my team, because I'm black and she's black?" *Id.* at 87:16-18. Plaintiff testified that she was working on a project with Mr. Hawkins, who was from another department, when Mr. Hawkins started to give the team "pushback." *Id.* at 88:20. Ms. Cahill then went to Mr. Hawkins' boss and thereafter the team worked with the boss. *Id.* at 88:22-24. Finally, Plaintiff described how, in ESO, "they" built a position for John Massey, a white man, but Mr. Massey did not want the position and so the position was opened for competition and Mr. Bland was ultimately selected. *Id.* at 89:2-19. Here, it is not even clear that Ms. Cahill was involved such that it would support Plaintiff's deduction that Ms. Cahill does not like black people. In any event, with respect to the limited information provided for each incident, race discrimination is not the only explanation for such actions and in many cases not even the reasonable conclusion to draw. The example with respect to Mr. Hawkins is particularly telling, because Plaintiff concedes that Mr. Hawkins was pushing back and creating an obstacle to her

*Ford, Inc.*, 2002 WL 32397234, at *6 (E.D. Va. Feb. 4, 2002) ("If the speculation of the plaintiff regarding his own employment is inadequate, then the unsupported opinion of other individuals regarding their adverse employment action is insufficient to support the plaintiff's claim of discrimination."); *Anthony v. United Airlines, Inc.*, 2024 WL 4800754, at *6 (E.D. Va. Oct. 10, 2024) (finding that "subjective beliefs" that "it was well known that [a supervisor] did not like [Black women] or regard them the same as others who were male or not Black" could not "be the basis for a finding of pretext"). Thus, Plaintiff has failed to establish that there are genuine issues of material fact with respect to her reassignment or that a reasonable juror could determine that her reassignment was the result of race discrimination.

In the end, the record is replete with evidence that Plaintiff was creating a fracture with the Chief of Staff's Office.[28]  Indeed, Mr. Bland, with whom Plaintiff appears to have a good relationship, testified that Plaintiff told him that she "was not willing to train the -- the person that was ultimately selected for the job and -- and refused to train that individual." Dkt. 30-1, Booker T. Bland Dep. Tr. at 84:3-11; *id.* at 83 (stating that Ms. Cahill informed him that Plaintiff "was not willing to perform tasks and -- and duties that were within the chief of staff's office").  Moreover, Plaintiff herself stated in a document that she did not intend to share her work with Ms. Breault and that "I've taken all my work off of the share drive . . . that person can figure it out for

_____

team getting their assigned work completed, and Ms. Cahill, as her supervisor, appears to have simply removed the obstacle.

[28] Because the evidence regarding the fracture is undisputed and because Plaintiff does not address either proffered legitimate nondiscriminatory reason, the Court will not further address Defendant's argument that Plaintiff no longer wanted to be in the Chief of Staff's Office except to note that there is evidence in the record to support that Ms. Cahill believed that Plaintiff no longer wanted to be in the Office (Dkt. 30-1 at 458) and the portions of Plaintiff's deposition testimony reviewed by the Court do not contradict it (Dkt. 30-1, Plaintiff Dep. Tr. at 120:2-3) (Plaintiff testifying that she does not remember what was said at the July 6, 2022 meeting with Ms. Cahill).

themselves." Dkt. 30-2 at 98-99. Ms. Cahill also had the correspondence between Ms. Brown and Plaintiff in which Plaintiff pushed back on inquiries that Ms. Brown made regarding deadlines. *See* Dkt. 30-2 at 110-14. The Fourth Circuit has found that emails where the tone is "unmistakably insubordinate and insolent" do not support a finding of pretext and properly result in the entry of summary judgment in favor of an employer who based an adverse employment action on such behavior. *See Johnson v. Mechanics & Farmers Bank*, 309 F. App'x 675, 686 (4th Cir. 2009). In sum, the record shows that Plaintiff was upset regarding her nonselection for the Position, that she did not intend to support Ms. Breault in the Position, and that the tone of her emails was insubordinate, all of which supports Defendant's proffered legitimate, nondiscriminatory reason which stands unrebutted. Moreover, even if Plaintiff had shown that the fracture Plaintiff was creating within the Chief of Staff's Office was not the reason for the transfer, Plaintiff has not created a genuine issue of material fact that the real reason was race. *See Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995) (noting that plaintiff "must prove *both* that the reason [for the defendant's actions] was false, *and* that discrimination was the real reason for the challenged conduct").[29] Accordingly, there are no genuine issues of material fact, and Plaintiff has failed to establish that a reasonable jury could find pretext. Thus, the Court will grant the Motion in this regard as well.

## V. CONCLUSION

In sum, Plaintiff has failed to establish that any genuine issues of material fact exist to preclude summary judgment, and Plaintiff has failed to establish that a reasonable jury could find Defendant's legitimate, non-discriminatory reason to be pretextual with respect to either her

---

[29] Evidence in the record also supports that ESO was severely understaffed and in need of personnel. Dkt. 30 ¶¶ 84-85; Dkt. 32 at 9 (facts are undisputed).

nonselection and her transfer. Accordingly, it is hereby ORDERED that Defendant's Motion for Summary Judgment (Dkt. 29) is GRANTED; and it is

FURTHER ORDERED that the Clerk of Court is DIRECTED to enter Rule 58 judgment on behalf of Defendant and against Plaintiff; and it is

FURTHER ORDERED that the Clerk of the Court is DIRECTED to place this matter among the ended causes.

It is SO ORDERED.

Alexandria, Virginia
August __1__, 2025

/s/

Rossie D. Alston, Jr.
United States District Judge